**UNITED STATES of America,**
**Plaintiff,**

**v.**

**NUTRITION SERVICE, INC., a corporation, Drosnes-Lazenby Cancer Clinic, a partnership, Philip L. Drosnes, Lillian M. Lazenby, Joseph M. Wilson, M.D., and Geraldine M. Maiden, Individuals, Defendants.**

**Civ. A. No. 64–4.**

United States District Court
W. D. Pennsylvania.

Feb. 17, 1964.

Gustave Diamond, U. S. Atty., Stanley Greenfield, Asst. U. S. Atty., Pittsburgh, Pa., Salvatore L. Franchino, Washington, D. C., Food & Drug Adms., for plaintiff.

Homer W. King, Pittsburgh, Pa., Kirkpatrick W. Dilling, Chicago, Ill., for defendants.

ROSENBERG, District Judge.

## PRELIMINARY STATEMENT

The United States of America, as plaintiff, filed its complaint for a permanent injunction, which included a prayer for a temporary restraining order, pending a hearing for a preliminary and final injunction.

The action is brought under the provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 301 et seq.[1] The plaintiff here seeks to restrain and prevent the defendants from the manufacture, preparation, propagation, compounding or processing and distributing in interstate commerce a product which they have named Mucorhicin.

The plaintiff maintains here that this is a drug, and the defendants have failed

1. Act of June 25, 1938, c. 675, § 1, 52 Stat. 1040.

to comply with the Act in (1) that defendants are violating § 331(d) [2] by shipping in interstate commerce a new drug, without having secured the Food and Drug Administration's· approval of a new drug application as required by § 355(a) [3]; (2) that Mucorhicin is misbranded within the meaning of § 352(l) [4] in that it purports to be and is represented as an antibiotic drug and is neither certified nor exempted from certifications as required by § 357(a) [5]; (3) that defendants are charged with the interstate shipment of drugs which are adulterated within the meaning of § 351(a) (2) (B) [6] in that the methods used in and the facilities and controls used for its manufacturing, processing, packaging or holding do not conform to current good manufacturing practice; and (4) that the defendants violate the Federal Food, Drug, and Cosmetic Act by failing and refusing to register as producers of drugs, as required by § 360(b) and (c).[7]

A hearing on the petition was originally set for January 9, 1964, and by stipulation of the parties it was continued on two occasions and finally agreed to be heard on Monday, January 20, 1964.

The plaintiff produced a great deal of evidence, both testamentary and documentary, in support of its contentions,

2. "§ 331. Prohibited acts
"The following acts and the causing thereof are prohibited : * * *
"(d) The introduction or delivery for introduction into interstate commerce of any article in violation of section 344 or 355 of this title."

3. "§ 355. New drugs—Necessity of effective approval of application
"(a) No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) of this section is effective with respect to such drug."

4. "§ 352. Misbranded drugs and devices
"A drug or device shall be deemed to be misbranded—
"(l) If it is, or purports to be, or is represented as a drug composed wholly or partly of any kind of penicillin, streptomycin, chlortetracycline, chloramphenicol, bacitracin, or any other antibiotic drug or any derivative thereof, unless
"(1) it is from a batch with respect to which a certificate or release has been issued pursuant to section 357 of this title, and (2) such certificate or release is in effect with respect to [any] such drug: Provided, That this subsection shall not apply to any drug or class of drugs exempted by regulations promulgated under section 357(c) or (d) of this title."

5. "§ 357. Certification of drugs containing penicillin, streptomycin, chloretracycline, chloramphenicol, bacitracin, or any other antibiotic drug—Regulations prescribed by Secretary; release prior to certification; 'antibiotic drug' defined
"(a) * * * For purposes of this section and of section 352(l) of this title, the term 'antibiotic drug' means any drug intended for use by man containing any quantity of any chemical substance which is produced by a microorganism and which has the capacity to inhibit or destroy microorganisms in dilute solution (including the chemically synthesized equivalent of any such substance)."

6. "§ 351. Adulterated drugs and devices
"Poisonous, insanitary, etc., ingredients ; adequate controls in manufacture
"A drug or device shall be deemed to be adulterated—
"(a) (2) (B) if it is a drug and methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with correct good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."

7. "§ 360. Registration of drug producers—Definitions
"Annual registration
"(b) On or before December 31 of each year every person who owns or operates any establishment in any State engaged in the manufacture, preparation, propagation, compounding, or processing of a drug or drugs shall register with the Secretary his name, places of business and all such establishments.
"New producers
"(c) Every person upon first engaging in the manufacture, preparation, propagation, compounding, or processing of a drug or drugs in any establishment which he owns or operates in any State shall immediately register with the Secretary his name, place of business, and such establishment."

and the defendants offered in defense testamentary evidence to the effect that Mucorhicin was not a drug but a food supplement. They also raise a number of legal questions.

From all of the evidence produced at the hearing of this case, I make the following:

## FINDINGS OF FACT

1. The defendant, Nutrition Service, Inc., is a corporation organized and existing under the laws of the State of Pennsylvania, incorporated October 7, 1963, and domiciled in the City of Pittsburgh at 4774 Liberty Avenue, Pittsburgh, Pennsylvania, within the jurisdiction of this Court.

2. The defendant, the Drosnes-Lazenby partnership, had been trading and doing business at 4774 Liberty Avenue, Pittsburgh, Pennsylvania, within the jurisdiction of this Court and has and had been trading and doing business as the Drosnes-Lazenby Cancer Clinic and the Drosnes-Lazenby Clinic.

3. Commencing on or about the year 1950, and prior to October 7, 1963, Lillian M. Lazenby and Philip L. Drosnes did business and operated under the name of "Drosnes-Lazenby".

4. There was at no time any official registration of an entity or combination of persons known as "Drosnes-Lazenby Cancer Clinic".

5. On May 19, 1950, Philip L. Drosnes had registered the name "Drosnes-Lazenby" under the Fictitious Names Act of the Commonwealth of Pennsylvania, said registration being in the Prothonotary's Office of Allegheny County, and being further registered in the State Department at Harrisburg, Pennsylvania. The avowed purposes of the business organization known as Drosnes-Lazenby were set forth in the application for said registration to be: "Research and development and manufacture of biologically processed foods".

6. The defendant, Philip L. Drosnes, an individual, is Secretary-Treasurer of the said corporation; has and had been acting at the said Drosnes-Lazenby Cancer Clinic as the Administrative Director; and resides at 914 N. Negley Avenue, Pittsburgh, Pennsylvania, within the jurisdiction of this Court.

7. The defendant, Lillian M. Lazenby, an individual, is president of the said corporation, Nutrition Service, Inc.; has and had been acting at the said Drosnes-Lazenby Cancer Clinic under the title of Associate Director; and maintains a summer residence at R. D. No. 2, Jamestown, Pennsylvania, within the jurisdiction of this Court.

8. The defendant, Joseph W. Wilson, M.D., an individual, is a physician licensed to practice medicine in the Commonwealth of Pennsylvania; is and was employed at the said Drosnes-Lazenby Cancer Clinic in the position of Medical Supervisor; is Research and Nutrition Director of the said corporation; and resides at 217 Sunset Drive, Pittsburgh, Pennsylvania, within the jurisdiction of this Court.

9. The defendant, Geraldine M. Maiden, an individual, is vice-president of said corporation; is and was an employee at the Drosnes-Lazenby Cancer Clinic and resides at 103 Aberyl Drive, Ross Township, Allegheny County, Pennsylvania, within the jurisdiction of this Court.

10. The defendants have been, up to the issuance of a Temporary Restraining Order in this cause on January 3, 1964, engaged in the business of manufacturing, processing, packing, labeling, promoting, selling and distributing in interstate commerce, an article designated as Mucorhicin.

11. The product, Mucorhicin, is derived from a fermentation and molding process of natural components of wheat, yeast, salt and water.

12. The product contains no synthetic or drug constituents.

13. The product has been analyzed by the plaintiff and the analyses have demonstrated that Mucorhicin has no antibiotic effects.

14. The product, Mucorhicin, is not an antibiotic drug.

15. There is no evidence that Mucorhicin as such has harmed anyone.

16. For a number of years prior to the formation of the corporation, Nutrition Service, Inc., the defendants under the name of Drosnes-Lazenby Clinic and Drosnes-Lazenby Cancer Clinic initiated correspondence by mailing directly to clinics, chiropractors, naprapaths and to doctors, copies of literature, letters of instructions, testimonials and other labeling of the product Mucorhicin summarizing its uses and results.

17. Prior to October 7, 1963, defendants dispensed or caused to be dispensed Mucorhicin in ½ ounce bottles, which contained a label with the following language:

### MUCORHICIN

Directions ........................
 Take ......................Drops
 Every .....................Hours
 ....................Times a Day
 ...................... Each Meal
 ...................... Bed Time

Joseph W. Wilson, M.D.
4774 Liberty Avenue
Pittsburgh 24, Pa.

18. The plaintiff has introduced uncontradicted evidence that in several instances the defendants under the name of Nutrition Service, Inc., employed the following method of distribution of Mucorhicin:

a. Separate letters were initiated by Food and Drug Administration Inspectors Larry Kerness and John W. Gilmore to the Drosnes-Lazenby Cancer Clinic and the Drosnes-Lazenby Clinic dated October 28, 1963 and December 10, 1963, respectively, which stated in effect that they had heard from friends that the Clinic had a treatment for cancer, or that Mucorhicin was good for cancer, and inquired whether this product was good for cancer of the lung and cancer of the prostate, respectively.

b. In response to the Inspectors' letters, they received answers under the signature of J. W. Wilson, M.D., advising, inter alia, that Nutrition Service, Inc. was the sole distributor of Mucorhicin and that it was available in a bottle containing an equivalent of a week's supply. The letter to Inspector Kerness also noted that there was no change in the formula of Mucorhicin, and that it was not a drug but a non-toxic food for special dietary uses.

c. Each inspector then placed a written order for several bottles of Mucorhicin.

d. Nutrition Service, Inc., responded to their request by sending an order of Mucorhicin with instructions that the product be taken according to the directions on the label without deviation from their suggested diet which was enclosed.

e. The answer of Nutrition Service, Inc., in each of the cases was in respect to the specific questions for cancer cure.

19. Prior to October 1963, the defendants' literature has consistently represented Mucorhicin as safe and effective in the treatment, mitigation, cure and prevention of many ailments and diseases, including cancer and some of the other serious diseases and ailments which affect mankind.

20. The labeling, promotional literature and other written, printed and graphic matter identified as Government's Exhibits Nos. 1 through 23, 26, 27, 29, 33, 35, 38, 40, 42 and 44 establish by means of specific claims, implications and overall effect upon the reader that Mucorhicin is an article intended for use in the cure, mitigation, treatment and prevention of cancer and other serious diseases in man.

21. On or about October 23, 1963, Nutrition Service, Inc., distributed a letter whereby it formally disclaimed any and all literature and publications theretofore issued pertaining to the product Mucorhicin requesting that the same be discontinued and disposed of.

22. The formation of the corporation, the mailing of Government's Exhibit 22 to all old customers of Mucorhicin requesting disposal of all literature and

labeling sent by the Drosnes-Lazenby Cancer Clinic or Drosnes-Lazenby Clinic, and the change in the bottle label of Mucorhicin, after the formation of the corporate defendant, indicates the defendants' desire to obviate the necessity for compliance with the Federal Food, Drug, and Cosmetic Act pertaining to drugs.

23. The defendants admit that Mucorhicin has no direct therapeutic, curative, palliative, mitigative or medicinal effect or action upon the actual cancer tissues or tumors in the patient taking Mucorhicin.

24. The defendants issued a letter, Government's Exhibit No. 22 to its old customers, in which it was stated that "Mucorhicin is not a drug, but a nontoxic food for special dietary uses"; that this letter directed that the green bound brochure, Government Exhibit 12, was not to be used; and it further directed that all old literature on hand, similar to Government Exhibits Nos. 1 through 19, and 44, should be disposed of; that notwithstanding this letter these customers nevertheless relied upon such old literature and labeling and the representations contained therein in ordering Mucorhicin subsequent to the receipt of said letter.

25. Mucorhicin, as represented by the statement of dietary properties shown on the revised bottle label, is of no or is of insignificant nutritional value in the American diet either as a food supplement or dietary adjunct when taken by either healthy persons or those afflicted by disease.

26. Neither the "special dietary use" for which Mucorhicin is to be taken nor the nutritional results allegedly attributed to Mucorhicin appear on the revised bottle label.

27. The defendants concede that no batch records, lot numbers or other means of product identification are used in the manufacture, processing, packing or holding of Mucorhicin.

28. Mucorhicin is represented and purports to be an antibiotic and a medicine.

29. The defendants concede that Mucorhicin is not an antibiotic and has no antibiotic properties but that its sole value is as a "synergistic agent".

30. No New Drug Application has been approved for Mucorhicin nor has any batch of Mucorhicin been certified or exempted from the certification requirements of 21 U.S.C.A. § 357 by the Department of Health, Education and Welfare.

31. The defendants have never registered with the Department of Health, Education and Welfare as producers of drugs.

32. The intended use of Mucorhicin in the cure, mitigation, treatment or prevention of cancer and other serious diseases in man is not negated by the purported disclaimers in the letter which is Government's Exhibit G22, or the new bottle label attached and made part thereof.

33. Mucorhicin is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use in the treatment, cure, mitigation and prevention of cancer and the many other serious diseases for which it is prescribed, recommended or suggested in its labeling.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter and the complaint states a cause of action under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq.

2. Mucorhicin is an article of drug within the meaning of 21 U.S.C. § 321 (g) (2).[8]

---

8. (g) "The term 'drug' means * * * (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; * * *."

3. Mucorhicin is a New Drug within the meaning of 21 U.S.C. § 321(p).[9]

4. The defendants' failure to obtain approval of a New Drug Application for Mucorhicin constitutes a violation of 21 U.C.S. § 355.[10]

5. The interstate distribution of the drug Mucorhicin by defendants without an approved New Drug Application is a violation of 21 U.S.C. § 331(d).[11]

6. The defendants' failure to secure batch certification or release therefrom, as required by 21 U.S.C. § 357 [12] for Mucorhicin which is represented and purports to be an antibiotic drug, renders the drug misbranded under 21 U.S.C. § 352($l$).[13]

7. The actions of defendants in distributing Mucorhicin in interstate commerce without batch certification or release therefrom as aforesaid, is a violation of 21 U.S.C. § 331(a).[14]

8. Mucorhicin, when caused to be introduced and delivered for introduction into interstate commerce, is adulterated within the meaning of 21 U.S.C. § 351 (a) (2) (B).[15]

9. The actions of defendants in distributing Mucorhicin, which is adulterated within the meaning of 21 U.S.C. § 351(a) (2) (B),[16] in interstate commerce is a violation of 21 U.S.C. § 331(a).[17]

10. The defendants violate 21 U.S.C. § 331(p)[18] in that they have failed to register as producers of drugs as required by 21 U.S.C. § 360.[19]

11. Mucorhicin is misbranded within the meaning of 21 U.S.C. § 352($o$)[20] in that it is a drug which was manufactured, prepared, propagated, compounded and processed in an establishment not duly registered under 21 U.S.C. § 360.[21]

12. The actions of defendants in making interstate shipments of Mucorhicin, which is misbranded within the meaning of 21 U.S.C. § 352($o$)[22] is a violation of 21 U.S.C. § 331(a).[23]

13. The evidence produced at the hearing of this matter supports the

9. (p) "The term 'new drug' means—
"(1) Any drug the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety of drugs, as safe for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a 'new drug' if at any time prior to the enactment of this chapter it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use; or
"(2) Any drug the composition of which is such that such drug, as a result of investigations to determine its safety for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions."

10. See Note 3.

11. See Note 2.

12. § 357. This section prescribes the duties of the Secretary of Health, Education and Welfare under title of "Certification of drugs containing penicillin, streptomycin, chlortetracycline, chloramphenicol, bacitracin—Regulations prescribed by Secretary; release prior to certification."

13. See Note 4.

14. § 331. Prohibited acts.
"The following acts and the causing thereof are prohibited:
"(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."

15. See Note 6.

16. See Note 6.

17. See Note 14.

18. (p). "The failure to register as required by section 360 of this title."

19. See Note 7.

20. ($o$) "If it is a drug and was manufactured, prepared, propagated, compounded, or processed in an establishment in any State not duly registered under section 360 of this title."

21. See Note 7.

22. See Note 20.

23. See Note 14.

necessity for issuance of a preliminary injunction.

14. The shipment of Mucorhicin in interstate commerce is productive of results which cause irreparable public harm.

15. The violation of Congressional directions relating to New Drugs will support the issuance of a preliminary injunction.

## OPINION

On May 15, 1950, in compliance with Pennsylvania law requiring certification of those doing business under a Fictitious Name, Philip Drosnes certified that he was the person owning and interested in the business known as Drosnes-Lazenby, that the business was the "research, development, and manufacture of biologically processed foods", and that it was to be carried on at 4774 Liberty Avenue, Pittsburgh 24, Pennsylvania. Registration was also had with the Secretary of the Commonwealth pursuant to Pennsylvania law. Since that time Philip L. Drosnes, Lillian M. Lazenby, Joseph W. Wilson, M.D., and Geraldine M. Maiden have been associated with the business.

The business was noted primarily, if not exclusively, for its production and promotion of Mucorhicin. This product results from the use of wheat basically with salt and yeast by fermentation, molding and aging. A liquid is eventually obtained, bottled and dispensed as Mucorhicin.

Prior to the institution of this cause of action, the defendants maintained two places where the business was carried on: one, at Jamestown, Pennsylvania, and two, at 4774 Liberty Avenue, Pittsburgh, Pennsylvania.

During these past years, much varied printed matter was distributed throughout the United States designating Mucorhicin for use by persons suffering with diseases and particularly cancer, and more particularly terminal cases of cancer. The distribution became widespread and many testimonials of its benefits for relief from disease were forthcoming. The defendants attempted to get aid from the American Cancer Society and from the Government but were never successful.

In October 1963, a corporation, Nutrition Service, Inc., was formed and the various recipients of the printed matter were told to destroy these because of the creation of the corporation.

The plaintiff contends that Mucorhicin is a drug. The defendants' primary defense is that it is not a drug but rather a food product. They say in their Memorandum of Law at page 1:

"The action of the plaintiff in the within matter is predicated upon the proposition that the subject material 'Mucorhicin' is a 'drug', whereas, it is the contention of the corporate defendant and the individual defendants connected therewith, that the subject matter is not a 'drug', but is and was at the time of institution of this suit, a food product of biologically processed whole wheat grain and is sold and distributed for special dietary purposes through licensed members of the healing arts for special dietary uses."

Is this product identified by the name "Mucorhicin" a drug or a food product?

The plaintiff has presented evidence that:

1. During the past years, Mucorhicin was introduced and distributed through the means of printed matter supports such as communications in the form of letters, circulars, reprints of publications, directions to would-be purchasers and the like;

2. It was distributed solely in relation to its use as a treatment, cure and mitigant of disease and especially cancer;

3. The methods used and the facilities and controls used for its manufacture, processing and packing do not conform to current good manufacturing practice;

4. It is manufactured under non-sterile conditions;

5. It is manufactured by no control system;

6. The defendants have no qualified personnel;

7. The defendants filed no new drug application for the product;

8. Mucorhicin is shipped in interstate commerce without the approval of the Food and Drug Administration as required by law;

9. The defendants have never registered as drug producers as required by law;

10. The interstate shipment of this product produced in a non-registered drug establishment renders the product as a drug misbranded under the law.

11. It is misbranded also within the meaning of the law in that it purports to be and is reported as an antibiotic, neither certified nor exempted from certification as required by law;

12. It is promoted by accompanying written, printed and graphic materials which gave the impression that it was an antibiotic;

13. It is not generally recognized among experts who are qualified by scientific training and experience to evaluate the safety of drugs;

14. It is distributed and prescribed by healers who are not permitted by law to prescribe drugs; and

15. The quantities of food elements such as carbohydrates, proteins, etc., are infinitesimal and its contribution to any food diet is nil.

The defendants' evidence is to the effect that:

1. Food values were printed on the label of Mucorhicin because counsel had so advised;

2. The essential value of the food was synergistic;

3. It created in other foods the ability to become ingested or assimilated or utilized by the tissues of the body;

4. Such action halted the breakdown of tissues by degenerative diseases;

5. In this manner the disease was arrested and reduced with marked improvements in the physical being of the victims;

6. Mucorhicin is made under sanitary conditions, although there is no denial that it was not made under sterile conditions;

7. It is made by a former hospital dietician, under the supervision of a medical doctor;

8. Since 1950 there had been distributed various kinds of reading matter which indicated that it was a dietary aid for diseases and particularly for cancer;

9. This reading matter was withdrawn from the general public by a letter in October 1963, addressed to all known subscribers telling them to destroy the literature;

10. This was not done because the reading matter was not factual and true, but rather because in October 1963, the partnership had been changed over to Nutrition Service, Inc., a corporation, and new reading matter would be sent out in the new name, although such new reading matter would be carefully reworded under the advice of counsel before it was prepared;

11. Five hundred and more doctors had been related with or became recipients of Mucorhicin and these doctors were from the United States and seven foreign countries; and

12. The defendants' records showed more than 5,000 Mucorhicin-aided cases of disease, and that two examples of these were:

a. Case No. 20 was that of a three and one-half year old boy who suffered with carcinoma of the right eye. After attention by an eye specialist and the performance of surgery and the administering of 24 deep X-ray treatments, the sight of the left eye continued to fail, but when sometime later after Mucorhicin therapy was applied, the patient, after one week had a recovery from low-grade temperature, the appetite increased and he began to gain weight. The last report showed a steady improvement and when taken to the family doctor, it was found he had 33 and 1/3 percent improvement in the vitality of his left eye.

b. Case No. 8 involved carcinoma of the abdominal wall of a woman patient

who was advised by doctors that she had four months to a year to live with X-ray treatments. With the administering of Mucorhicin therapy, her ailment abated and she became better. At the last hearing from her, she was considerably improved.

From all of the evidence preliminarily presented in this case, I am unable to find that Mucorhicin is a food. I have weighed and re-weighed the evidence in this case and the balance remains overwhelmingly convincing that Mucorhicin was dispensed and used in the treatment, cure, prevention and mitigation of disease. The evidence produced orally at the preliminary hearing preponderated in favor of that finding. The evidence as produced by the plaintiff alone, during the preliminary hearing supported that finding, and when the plaintiff produced evidence that its Inspector Larry Kerness requested by letter aid in the curing of cancer of the lung on October 28, 1963, and that its Inspector John W. Gilmore by letter on December 10, 1963, requested aid in the treatment of cancer of the prostate, and that the defendants offered Mucorhicin as the dietary aid in response, there was late evidence of the continued holding out of Mucorhicin as a treatment, cure, mitigation or prevention of disease.

The defendants had been so insistent throughout that Mucorhicin was only a nutritional aid that I had expected and believed there would be proof forthcoming of that contention. None, however, was presented. For the defendants, only Dr. Wilson, its medical director, testified; and if any proof were needed to support the plaintiff's case, he added much which convinced me that Mucorhicin was being used for the cure, treatment, mitigation and prevention of disease.

He talked only of disease and cure. He indicated that 5,000 patients in the United States and in seven other countries were on record as having been treated, cured and remedied by Mucorhicin. Of these many cases, he chose the two of the boy and the woman cancer patients as examples.

He spoke as a doctor. He spoke of diseases and he spoke of cures for these diseases by the administering of Mucorhicin. After the hearing had closed, I was able to properly examine the exhibits and here was more of the same proof going back through the many years —disease and Mucorhicin coming to the aid, treatment, prevention and mitigation of disease.

At the hearing of this case, the defendants testified through Dr. Wilson that Mucorhicin (Tr. pg. 406) is a food product and that it comes within the definition of that which gives body nourishment and heat. At the same time in answering the plaintiff's contention that the dietary food value as printed on the label of the bottle was nil, Dr. Wilson admitted that Mucorhicin was not being administered for its carbohydrate or protein contents as a food but rather because it was "synergistic"—that is, that it possessed the power to correlate foods and so make them become nutritional. By this contention then, Mucorhicin in itself is not a food but perhaps a catalyst, in any event an agent which causes food to become absorbed and alimentary to the tissues in the human body. As for the words "synergist" [24], "synergistic" and the like, it is obvious that these words are not exclusive with the defendant, Dr. Wilson, for it has been availed in connection with enzymes, vitamins, and the like in a case where health products have been held to be drugs. V. E. Irons, Inc. v. United States (C.A. 1, 1957), 244 F.2d 34. Mucorhicin, the defendants contend, is the food agency by which war is waged against disease. But by the defendants' contention here, it would appear that Mucorhicin is not so much a matter of nutrition as of biological chemistry. But whether one of nutrition or

24. Dorland's Illustrated Medical Dictionary, 23rd Edition, 1961 defines "synergist" at page 1349 as follows:

"A medicine which aids or cooperates with another; an adjuvant."

chemistry, it is difficult to disassociate the defendants' present theory from the wording of their printed matter disseminated prior to October 1963.

The printed matter as set forth in the exhibits, taken as a whole, again, does not support the defendants, but rather the plaintiff in its contention that Mucorhicin has been used for cure, treatment, mitigation and prevention of diseases in man. All this evidence taken as a whole shows a continuity of purpose for the distributing and dispensing, from the years back and up to the present time, and of impressing would-be users of the value in, Mucorhicin for the curing, treating, preventing and mitigating disease. And this is so in spite of the fact that the defendants in October 1963, recalled all printed matter and directed or instructed all subscribers, customers and the like to destroy such printed matter.

Certain evidence was presented by the plaintiff that the defendants here claimed for Mucorhicin antibiotic qualities by reason of a relationship with penicillin.[25] The defendants countered this by their claim that Mucorhicin contained a strain of *penicillium*[26] and that the many strains of *penicillium* in themselves are factually a part of many foods, as for instance in the case of such food as roquefort and camembert cheese. While in fact it may be true that mold growth exists naturally in certain foods and that such foods are sold regularly there is essentially this difference, that such foods are sold only as foods and not for treatment, mitigation and prevention of disease. If cheese were to be sold by any processor for the cure, treatment, mitigation and prevention of disease under the classification of food, within the provisions of the Food and Drug Act, it would be necessarily a drug.

The fact that salt normally forms a part of the average person's dietary intake would not justify the marketing of a salt solution for gargling and mouth rinses to prevent disease as a food. Where mineral water in its original state is served as a beverage, after processing and separation of the constituent elements, it is no longer usable as a beverage but as a commercial water in small quantities, there is justification for classifying it as a drug. Goodwin v. United States (C.A. 6, 1924), 2 F.2d 200.

▮ The fact that the defendants have and are maintaining that Mucorhicin was and is a food and that they even registered with the State and County in 1950 as showing that they were researching in food does not help the defendants here. The real test is how was this product being sold? If as a food, was it for the furnishing of energy and body building? Or was it being sold for the treatment and mitigation of disease? The answer is presented all through the evidence that treatment, cure, mitigation and prevention of disease was the purpose for which Mucorhicin was sold by the defendants and bought (and very frequently prescribed) by the purchasers. No matter how loud and long one may declaim that black is white, black is nevertheless black. The same is true here. Designating Mucorhicin as a food supplement and recommending its merits in curbing death gripping diseases does not make it a food under the provisions of the Food and Drug Act.

The defendants do not, in fact, assert that it is a food. As I have already said, they maintain it is a dietary aid, but they maintain at the same time that it is to be used for the treatment, mitigation, prevention and cure of diseases —serious diseases and terminal cases for

25. Webster's New Collegiate Dictionary, 1960, defines penicillin as "a strongly antibacterial, relatively nontoxic acid substance extracted from a green mold and having a powerful bacteriostatic effect against staphylocci, gonococci, pneumococci, hemolytic streptococci, and certain meningococci."

26. Webster's New Collegiate Dictionary, 1960, defines penicillium as "any of a genus of fungi typified by the mold found on decaying or preserved fruit, cheese, etc."

which, as the defendants have publicized, medical doctors have oftentimes given up hope.

■ Nor does the argument help the defendants that they are within the provisions of the Code of Federal Regulations under the captions "Special dietary uses" [26a] and "General label statement" [27] which provide for food for special diets used in the young, the aged and persons with certain diseases and body deficiencies such as heart conditions and diabetes. I conclude that Mucorhicin is not one of these permissible foods for it appears that the permissible foods are those which have food characteristics which may supplement in the treatment of disease. In this case, Mucorhicin is fundamentally and exclusively the treatment. It may be that the defendants have a proper food and it may be that the defendants have a right to manufacture and distribute such food, but from the evidence here presented before me, I must find that it comes within the meaning of § 321(g) (2)[28] of the Food and Drug Act which classifies it as a drug.

The defendants further argue at page 7 of their Supplemental Memorandum:

"The product was clearly labeled as a 'Food for Special Dietary Use'. The product was described on said label as 'Enzymatic extract of biologically processed whole wheat grain'. Said label stated, further, that the product is 'Not a drug. Results are nutritional only.' The directions for use set forth on said label clearly delineated said product as a dietary supplement."

The label actually sets forth nothing. It indicates only that certain nutritional factors exist, however, as was explained by Dr. Wilson at the hearing, counsel had advised the defendants to set out on the label the nutritional factors. To the uninitiated (and perhaps to particularly the suffering mind) the label gives hope when in fact it says nothing. More particularly, the label gives hope to those who have seen or heard or know of the advertised possibilities held out in the previously printed matter—and this in spite of defendants' request to the users and would-be users and would-be dispensers to have such printed matter destroyed. As is herein stated, this printed matter is part of the label. V. E. Irons, Inc. v. United States, supra.

■ Under all the evidence as presented before me, I must conclude that Mucorhicin was distributed and dispensed, and was distributed and dispensed as of the time this action was brought, in interstate commerce for the cure, treatment, mitigation and prevention of disease in man. United States v. Hohensee (C.A.3, 1957), 243 F.2d 367, 370, cert. den. 353 U.S. 976, 77 S.Ct. 1058, 1 L.Ed.2d 1136; V. E. Irons, Inc., v. United States, supra.

■ Another question which the defendants raise is whether or not the exhibits representing the printed matter relating back through the many years in which Mucorhicin has been distributed by the present defendants and the preceding defendants as individuals were admissible in evidence because of the remoteness of time. I hold that they are properly admissible in evidence. Where a distributor of a product has given its customers literature making therapeutic claims, and years later customers purchase the product in reliance on the literature in the ordering of and prescribing of the product, such literature may be examined by the Court to determine whether the product is a drug despite any disclaimer on the part of the distributor. United States v. 3 Cartons, More or Less, "No. 26 Formula GM etc.", 132 F. Supp. 569, 574 (S.D.Cal., 1952); V. E. Irons, Inc., v. United States, supra.

■ The defendants objected to the introduction into evidence of Exhibits G1 through G21, printed material issued or distributed prior to October 1963, de-

26a. 21 CFR, 1.11, See Appendix I.

27. 21 CFR, 125.2, See Appendix II.

28. See Note 8.

claring remedial powers of Mucorhicin, because the defendants had sent letters instructing correspondents to destroy all such printed matter. Even if this amounted to a disclaimer, such disclaimer will not avoid the legal consequences of a long-time distribution of the varied printed matter defining the product and looking to its intended use, by creating the impression that the product has value in the treatment of disease. United States v. 3 Cartons, More or Less, "No. 26 Formula GM etc.", supra.

This would be so even if the disclaimer was made that there was no scientific evidence that the product had therapeutic value. But that is not the case here. Dr. Wilson, testifying for the defendants, repeated that everything stated in the printed matter was true, and that only because of the business change to a corporation was there a reason for the withdrawal of such printed material and the request to their correspondents to destroy all previously issued printed matter.

This testimony shows ratification and re-affirmation of the printed matter and gives it equal vitality at this preliminary hearing equal to that which it had when issued. It is, therefore, equally relevant to prove the plaintiff's contention and is legally admissible.

■ The defendants also objected to the admission in evidence of Exhibits G13, G14, G15, G16 and G20 which are reprints from published periodicals and radio broadcasts. They maintain that it is unconstitutional to interfere with the dissemination of reprints from newspapers. The question here is not one of constitutionality but one of adoption. In making these reprints, which related to their product and distributing these to the prospective or actual customers and users of Mucorhicin, the defendants and predecessor defendants adopted the content of the reprints as their own representations and so became bound by them. V. E. Irons, Inc. v. United States, supra; Colgrove v. United States (C.A.9, 1949), 176 F.2d 614, 617, cert. den. 338 U.S. 911, 70 S.Ct. 349, 94 L.Ed. 561 (1950).

■ The defendants also maintain that this action must be dismissed because the plaintiff has made no showing of irreparable injury. They assert that there has been no showing that Mucorhicin has harmed or injured anyone, nor that there is any such immediate threat. It is true that the evidence presented at this hearing did not show that the use of Mucorhicin by anyone or the administering of it to any person produced any harmful effects. But that does not mean that because such evidence has not been introduced, that the hope held out by the producers of Mucorhicin to the medically aidable patients may not induce them to delay medical treatment by competent doctors to the extent where they become less capable or incapable of being aided, and so cause irreparable public injury. The admission by the defendants that the distribution of Mucorhicin is widespread over the entire nation contradicts the argument that only scattered individuals could be so affected. Congress intended that all persons in the national domain be protected against any such injury and this is reason enough for preventing any irreparable injury existing or threatening the public. The distribution of Mucorhicin as a hope-giving treatment may realistically and consequentially produce irreparable injury to the public. I am, however, persuaded by something more.

In the case of United States v. Ingersoll-Rand Company et al., (W.D.Pa., 1963), 218 F.Supp. 530, affirmed by the Court of Appeals for the Third District at 320 F.2d 509, this is said:

"The enactment into law of the proposed amendment was an expression of the public policy of the nation, and the threatened violation of the law here is itself sufficient public injury to justify the requested relief. The Congressional pronouncement in § 7 embodies the irreparable injury of violations of its provisions. No further showing need be made by those directed to enforce that section than that it is being violated or threatened with violation. Nor is it

necessary to demonstrate the precise manner in which violation of the law will result in injury to the public interest. It is sufficient to show only that an act or threatened act is within the declared prohibition or Congress."

Although this case related to a prohibition by Congress of business consolidations, it is no less true here where the acts or threatened acts are within the declared prohibition of Congress under the Food and Drug Act.

The Food, Drug, and Cosmetic Act like the Clayton Act provides for injunctive relief.[29] Its provisions similar to the Clayton Act were adopted by Congress in the public interest and it should be given a liberal interpretation. United States v. Sullivan, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297 (1938); United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48, (1943); Research Laboratories v. United States, 167 F.2d 410, (C.A.9, 1948), cert. den. 335 U.S. 843, 69 S.Ct. 65, 93 L.Ed. 393 (1948); United States v. Kordel, 164 F.2d 913 (C.A.7, 1948), affirmed 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948).

 There is sufficient showing, where as here, the Government presents evidence of violations of the provisions of a statute enacted for the protection of the public. United States v. City and County of San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940); American Fruit Growers, Inc., v. United States, 105 F.2d 722, 725 (C.A.9, 1939); Henderson v. Burd, 133 F.2d 515, 517, 146 A.L.R. 714 (C.A.2, 1943). Nor is it necessary to demonstrate the precise way in which violations of the law might result in injury to the public interest. It is sufficient to show only that the threatened act is within the declared prohibition of

Congress. United States v. Ingersoll-Rand Company et al., supra. It is sufficient here to show that "articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man * * * or articles (other than food) intended to affect the structure or any function of the body of man *, * " was and is being distributed in violation of the Food and Drug Act. This has been shown here.

Prior to hearing, the defendants filed a motion to dismiss the action as to Drosnes-Lazenby Cancer Clinic, a partnership. This motion was based upon the fact that Nutrition Service, Inc., a corporation, had assumed the functions of making and distributing Mucorhicin. I withheld decision until I heard evidence upon which I could make a determination.

The evidence before me is that Philip L. Drosnes filed, as required by Pennsylvania law in the office of the Secretary of the Commonwealth and the Prothonotary of Allegheny County, a statement to the effect that the business to be carried on or conducted was the "Research, development, and manufacture of biologically processed foods."

Evidence appears in this case that Nutrition Service, Inc., was incorporated and began operation in connection with the manufacture and distribution of Mucorhicin. There is no evidence here of whether or not an assignment or transfer was made from anyone to anyone. There is no evidence of a withdrawal under the Fictitious Names Act of Mr. Drosnes in accordance with the prescribed law.[30]

 The evidence here was presented against the individuals, Philip L. Drosnes, Lillian M. Lazenby, Joseph M. Wilson, M.D. and Geraldine M. Maiden, in addition to the corporation, Nutrition Service, Inc. There was no evidence

29. 21 U.S.C.A. § 332 provides: Injunctive Relief.
(a) "The district courts of the United States and the United States courts of the Territories shall have jurisdiction, for cause shown, and subject to the provisions of section 381 (relating to notice to opposite party) of Title 28, as amended, to restrain violations of section 331 of this title, except paragraphs (e), (f), and (h)–(j) of said section."

30. Act of May 24, 1945, P.L. 967, § 7, as amended 1957, June 5, P.L. 258, § 2, 54 P.S. § 28.7 (Commonwealth of Pennsylvania).

presented that Drosnes-Lazenby Cancer Clinic exists presently as a partnership, although it may easily be concluded from the evidence that the individuals had carried on the Drosnes-Lazenby Cancer Clinic at a previous time. Since no evidence exists of a partnership but only as to the individuals, the partnerhip as a defendant will be dismissed and the individuals and the corporation will be continued as defendants.

I have heard and viewed the evidence presented before me to the end only of determining whether or not a preliminary injunction should issue. I have made Findings of Fact and Conclusions of Law to such an end. Accordingly, while I am now in a position to make a determination that a preliminary injunction should issue, I am not in any position at the present time to indicate that a permanent injunction can or should issue. The parties must be given adequate time to prepare for a final hearing. The defendants will need time to prepare and file answers and to prepare a proper defense.

When all of the pleadings have been filed and pretrial proceedings had, a final hearing must be set in order to arrive at a determination as to whether or not the facts and the law of the case support a permanent injunction, and no pre-judgment is intended to be made here.

For the present, a preliminary injunction will be granted against the defendants, as modified by this opinion.

## DECREE FOR PRELIMINARY INJUNCTION

The United States of America having filed its complaint on the 3rd day of January 1964, and testimony having been taken, and the United States of America having moved this Court for this injunction;

Therefore, it is ordered, adjudged and decreed, as follows:

1. That the Court has jurisdiction of the subject matter herein and of all persons or parties hereto and the complaint states a cause of action against the defendants under the Federal Food, Drug, and Cosmetic Act;

2. That the defendants, Nutrition Service, Inc., a corporation, Drosnes-Lazenby Cancer Clinic, Philip L. Drosnes trading and doing business as Drosnes-Lazenby, Philip L. Drosnes, Lillian M. Lazenby, Joseph W. Wilson, M.D., and Geraldine M. Maiden, individuals, their officers, agents, servants, employees, representatives, and all other persons in active concert or participation with them or any of them, be and they are hereby preliminarily restrained and enjoined, until final hearing of this cause of action, under the provisions of 21 U.S.C. § 332 (a) from directly or indirectly doing or causing to be done any of the following acts:

(1) engaging in the manufacture, preparation, propagation, compounding, or processing of Mucorhicin, or any other drug, in establishments owned or operated by them unless and until they register with the Secretary of Health, Education and Welfare the name of each of the owners or proprietors, their places of business and all their establishments which are engaged in the manufacture, preparation, propagation, compounding or processing of Mucorhicin, or any other drug;

(2) engaging in the manufacture, preparation, propagation, compounding, or processing of Mucorhicin, or any other drug, in establishments owned or operated by the said Nutrition Service, Inc., unless and until the said corporation registers with the Secretary of Health, Education and Welfare, its name, including the name of each corporate officer and director and the state of incorporation, its places of business, and all its establishments which are engaged in the manufacture, preparation, propagation, compounding or processing of Mucorhicin, or any other drug;

(3) causing the individual defendants to fail to register with the Secretary of Health, Education and Welfare, the name of each defendant, their places of business and all establishments of the said

individuals who are engaged in the manufacture, preparation, propagation, compounding or processing of Mucorhicin or any other similar drug;

(4) causing the corporation of Nutrition Service, Inc., to fail to register with the Secretary of Health, Education and Welfare the name of the corporation, including the name of each corporate officer and director and the state of incorporation, its places of business and all the establishments of the said corporation which are engaged in the manufacture, preparation, propagation, compounding, or processing of Mucorhicin or any other similar drug;

(5) introducing or causing to be introduced and delivering or causing to be delivered for introduction into interstate commerce the article of drug designated as "Mucorhicin" or any other drug which has been and is manufactured, prepared, propagated, compounded or processed in the establishment of a person whose name, places of business and establishments engaged in the manufacture, preparation, propagation, compounding and processing of Mucorhicin or any other drug are not registered with the Secretary of Health, Education and Welfare;

(6) introducing or causing to be introduced and delivering or causing to be delivered for introduction into interstate commerce, Mucorhicin, or any other similar drug, manufactured, processed, packed or held by the said defendants, or by others, at the home of Mrs. Lillian M. Lazenby at Jamestown, Pennsylvania, at the Drosnes-Lazenby Cancer Clinic, at 4774 Liberty Avenue, Pittsburgh, Pennsylvania, or elsewhere unless and until

(a) adequate methods and controls are established and administered in conformity with good manufacturing practice as prescribed by regulations (28 F.R. 6385–6387), which methods and controls shall specifically include, among other things, the following:

(1) that all components used in the manufacture of drugs are identi-fied, tested, and inventoried, and are stored clearly marked in a manner which will assure that only those components which meet specifications are used, after such identification, testing, and inventorying has been made:

(2) a master formula record is prepared which clearly shows as a part of the essential information;

(a) the name of the product, its dosage form, and the label and labeling to be used;

(b) a complete and accurate batch formula for each batch size to be produced from the master formula including a list of ingredients, an accurate statement of the weight or measure of each ingredient, and a statement of the theoretical yield; and

(c) manufacturing and control instructions, procedures, specifications, special notations, and precautions which must be followed:

(3) an individual batch record is made for each batch of drug produced which shall

(a) be an accurate copy of the master formula, which copy shall be checked and endorsed by a competent responsible person;

(b) record each step in the manufacture of the drug; and;

(c) contain an appropriate batch number, which will permit determination of all laboratory control procedures, and results on the batch;

(4) each critical step in the manufacture of each batch of drugs is performed by a competent and responsible individual and checked by a second competent and responsible individual;

(5) all containers and equipment used in the manufacture of each batch are clearly labeled at all times to identify fully and accurately their contents, the stage of processing, and shall specifically state whether

the contents have been released for distribution;

(6) packaging and labeling operations are so controlled that only those batches of drug which have met the specifications of the master formula record are distributed;

(7) laboratory testing procedures are established and are performed by competent personnel, which will provide for adequate and accurate tests of all components and finished products for identity, strength, purity and quality; and

(8) maintenance of adequate control records including records of control numbers so that the complete manufacturing, processing, packaging, labeling and distribution history of each batch of drug can be determined; and

(9) duly authorized Food and Drug inspectors are granted free access to each place where the said manufacture, processing, packing and holding of Mucorhicin or any other similar drug is conducted for the purpose of making an inspection of such place, which inspection in addition to the building, pertinent equipment, finished and unfinished materials, containers and labeling, shall extend to all records relating to the methods used in, and the facilities and controls used for, the said manufacture, processing, packing and holding of the said Mucorhicin or any other similar drug, and a report is made by Inspectors to the Court which shows that the established methods, facilities and controls are in fact, operated and administered in conformity with current good manufacturing practice, the cost of any such inspection to be borne by the defendants;

(7) introducing or causing to be introduced and delivering or causing to be delivered for introduction into interstate commerce the article of drug designated as "Mucorhicin" under the name "Mu-corhicin" or any other name, unless and until:

(A) an approval of a new drug application, filed pursuant to 21 U.S. C. § 355 as amended, is effective with respect to the said drug; or

(B) the said drug is from a batch with respect to which an antibiotic certificate or release has been issued pursuant to 21 U.S.C. § 357 as amended, and is in effect with respect to the said drug.

(8) the defendants, Drosnes-Lazenby Cancer Clinic, Philip L. Drosnes, trading and doing business as Drosnes-Lazenby, Philip L. Drosnes, Lilliam M. Lazenby, Joseph W. Wilson, M.D., and Geraldine M. Maiden, individuals, shall give written notice of the provisions of this decree to each and all of their agents, servants, employees, representatives and any and all persons how or in the future in active concert or participation with them or any of them who assist or participate in the manufacturing, processing, packing, labeling, promoting, selling, and distributing in interstate commerce, the article of drug designated as "Mucorhicin" or any similar article of drug.

(9) The defendants shall file their answers within Twenty-Five (25) days from the date of this decree, and thereafter the parties will be directed for discovery and pre-trial procedure so that a final hearing may be had as soon as possible.

## APPENDIX I

## CODE OF FEDERAL REGULATIONS

### TITLE 21—FOOD AND DRUGS § 1.11

§ 1.11 Special dietary uses.

(a) The term "special dietary uses", as applied to food for man, means particular (as distinguished from general) uses of food as follows:

(1) Uses for supplying particular dietary needs which exist by reason of a physical, physiological, pathological or other condition, including but not limited to the conditions of diseases, convales-

cence, pregnancy, lactation, allergic hypersensitivity to food, underweight, and overweight;

(2) Uses for supplying particular dietary needs which exist by reason of age, including but not limited to the ages of infancy and childhood;

(3) Uses for supplementing or fortifying the ordinary or usual diet with any vitamin, mineral, or other dietary property. Any such particular use of a food is a special dietary use, regardless of whether such food also purports to be or is represented for general use.

(b) No provision of any regulation under section 403(j) of the act shall be construed as exempting any food from any other provision of the act or regulations thereunder, including sections 403 (a) and (g) and, when applicable, the provisions of Chapter V of the act.

## APPENDIX II

## CODE OF FEDERAL REGULATIONS

## TITLE 21—FOOD AND DRUGS § 125.2

§ 125.2 General label statements.

(a) If a food (including food to which any one or more of §§ 125.3 to 125.8, inclusive, is applicable) purports to be or is represented for any special dietary use by man, its label shall bear a statement of the dietary properties upon which such use is based in whole or in part. Such statement shall show the presence or absence of any substance, any alteration of the quantity or character of any constituent, and any other dietary property of such food upon which such use is so based.

(b) If a food (including food to which any one or more of §§ 125.3 to 125.8, inclusive, is applicable) purports to be or is represented for special dietary use by reason of its use for treating any disease resulting from a dietary deficiency in man, its label shall bear, in addition to the information required under paragraph (a) of this section, adequate directions for such use.