UNITED STATES of America, Plaintiff,

v.

GENERIX DRUG CORPORATION, a corporation, and Lewis Michael Orlove, and Gary R. Dubin, and Ofelia Perez, Individuals, Defendants.

No. 79–6655–Civ–NCR.

United States District Court,
S. D. Florida,
Fort Lauderdale Division.

June 12, 1980.

Ana H. Barnett, Asst. U. S. Atty., Miami, Fla., Jacqueline H. Eagle, Asst. Chief Counsel, Rockville, Md., for Drugs, Food & Drug Administration, Gerald C. Kell, Consumer Affairs Section, Antitrust Div., Dept. of Justice, Washington, D. C., for plaintiff.

Thomas Scarlett, Morgan, Lewis & Bockius, Washington, D. C., George M. Burditt, Burditt & Caulkins, Chicago, Ill., for defendants.

### ORDER

ROETTGER, District Judge.

This matter came before the court on plaintiff's motion for a preliminary injunction pursuant to 21 U.S.C. § 332. The Government has alleged that defendant, Generix Drug Corporation, distributes "new drugs" without an approved new drug application, and that such activity is proscribed by 21 U.S.C. § 355(a). Additionally, the Government has alleged that defendants have failed to comply with 21 U.S.C. § 351(a)(2)(B) which requires that repacking and labelling of drugs be performed only in circumstances that comply with current good manufacturing practices. The parties in open court announced that they had reached an amicable agreement with respect to the latter allegation. The parties declined to stipulate that the evidence presented could be consolidated and considered on the issue of a permanent injunction as permitted under Rule 65(a)(2).

The court having heard the testimony of witnesses, having read and considered exhibits received into evidence, having heard the arguments of counsel and considered the memoranda filed in this matter, hereby enters its findings of fact and conclusions of law.

### FINDINGS OF FACT

Defendant, Generix Drug Corporation, is a distributor of human drugs with a trade name of "Goldline" and has a plant in Hollywood, Florida.

Defendant ships its generic formulations containing the active ingredients, listed below, in interstate commerce without approved new drug applications (NDAs):

Allopurinol
Spironolactone with hydrochlorothiazide
Furosemide
Diethylpropion hydrochloride
Chlorothiazide with reserpine
Amitriptyline with perphenazine
Prochloreperazine maleate
Chlorthalidone

The above listed active ingredients, with the exception of chlorothiazide with reserpine, are generally recognized among qualified experts as safe and effective; each has been used to a material extent and for a material time for the uses recommended in the labelling employed by defendant.

Allopurinol is a drug widely used for the treatment of gout. Spironolactone is a drug used in the treatment of hyper-aldos-

teronism and in the treatment of a variety of edematous conditions.

Furosemide is one of the most widely-used drugs in the United States, and is used to treat hypertension and edema. Diethyl-propion hydrochloride is a drug which is used as an adjunct in treating obesity, and is listed in relevant pharmacological text books as an "anorectic".

Chlorothiazide with reserpine is a combination of drugs used in the treatment of hypertension. Each drug has been widely used and each is well known, although studies on the specific combination of chlorothiazide with reserpine are not readily available. Amitriptyline with perphenazine is a drug used in the treatment of anxiety and depression.

Defendant's "Goldline" specific formulations containing the six active ingredients discussed immediately above, together with their inactive ingredients—the excipients—have not been tested. Nor are they generally recognized among experts, who are qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective under the conditions of use prescribed, recommended or suggested in defendant's labelling.

No evidence relative to the safety and effectiveness of defendant's "Goldline" formulations containing the active ingredients of prochloreperazine maleate or chlorthalidone was presented at the hearing.

## CONCLUSIONS OF LAW

The question presented in this cause is a narrow one. It involves interpretation and application of 21 U.S.C. § 321(p), which defines the term "new drug" as it is used in the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. The statute provides that:

The term "new drug" means—

Any drug . . . the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition prescribed, recommended, or suggested in the labeling thereof,

.    .    .    .    .

Any drug . . . the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.

The introduction or delivery for introduction of "new drugs" into interstate commerce without approval of a new drug application (NDA) violates 21 U.S.C. § 355(a), and such conduct can be enjoined pursuant to 21 U.S.C. § 332.

It appears clear that defendants ship "Goldline" products in interstate commerce without having filed new drug applications (NDAs). Therefore, the only remaining task is to determine whether these specific generic drug products are "new drugs". Clearly this task is not a simple one; only a few courts have considered the question, and the interpretations of the statute have been rather varied.

After hearing testimony, this court is of the opinion that this difficulty flows from the complex nature of pharmaceutical manufacturing. The government's first expert, Dr. Roger Palmer, explained the factors and variables involved. Each drug product is composed of an active ingredient, or incipient, which represents up to 10% of the product, and excipients, such as binders, coating, and capsules, which account for the remainder.

A generic drug product represents an attempt by one pharmaceutical manufacturer to copy the drug product of another manufacturer where the active ingredient and excipients in the latter's formulation have been shown to be safe and effective. Because manufacturing techniques and variables differ, each copy of the recognized formulation combines the active ingredient which is generally recognized as safe and

effective with excipients unique to the individual manufacturer.

The government's experts testified that the variances in excipients due to different manufacturing processes can directly affect the bioavailability of the active ingredient. Bioavailability is a measure of the time it takes for a given drug product to deliver the active ingredient to the particular organ or area. Additionally, the differences in excipients can affect bioequivalence, a measure based on the comparison of one drug to another. Drug products which are bioequivalent can be used interchangeably for the treatment of the same illness.

Both government experts stressed the differences in bioavailability and bioequivalence between the proved safe and effective "pioneer drug" and the copy may affect the safety and efficacy of the generic drug product. This is especially true where the drug product involved is a sustained release drug. Differing rates of solubility due to differences in excipients may cause "dumping" of the active ingredient into the bloodstream all at once. In drugs where there is high toxicity, this may lead to an overdose.

In essence, the government argues that any difference between excipients renders a drug product a "new drug" within the meaning intended by the statute; the fact that an active ingredient is generally recognized as safe and effective is irrelevant to the discussion, according to the government. In short, the government's position is that generic or "copycat" drugs must receive approval as a new drug unless it is an exact copy of the incipient pioneer drug and also has no difference in excipients. Therefore, it is suggested "Goldline" products of defendant are "new drugs" due to differing excipients. With equal vigor defendants argue that if the active ingredient is generally recognized as safe and effective, the new drug product is not a "new drug" despite differences in excipients.

## APPLICABLE CASE LAW

The judicial trail is not clearly defined. Worse than having a fork in the trail, there are three sets of tracks which go off in three widely divergent directions.

In *United States v. Articles of Drug (Lannett)*, 585 F.2d 575 (3d Cir. 1978) *rehearing denied en banc*, the Third Circuit, by way of dictum, flatly rejected the same argument advanced by the government here and accepted Lannett's argument that "all that is required by the 'new drug' section—general safety and effectiveness recognition—has been provided and that bioavailability, bioequivalence and other quality control tests are irrelevant as to safety and efficacy." *Id.* at 582.

After a reading of *Lannett*, it becomes apparent that the Third Circuit did not have before it the type of evidence that has been offered in this cause. The evidence presented to this court is clear: differences in excipients can affect bioavailability and bioequivalence, and bioavailability and bioequivalence are intimately intertwined with safety and effectiveness.

In *Pharmadyne Laboratories, Inc. v. Kennedy*, 466 F.Supp. 100, 102 (D.C.N.J.1979) a district court within the Third Circuit, commenting on *Lannett*, extensively criticized the Third Circuit's dictum which it perceived as a serious misconstruction of the statutory definition of the term "new drug". In reasoning to the conclusion that the FDA's argument was indeed supported by the statute, the court stated:

In § 355(b), an NDA is to have a "full list of articles used as components of such drug" and a "full description of the methods used in and the facilities and controls used for, the manufacturing, processing and packing of such drug."

Components of a drug may well be (and usually are) things in addition to active ingredients. They may be the binder that permits the active ingredient to be administered in tablet form. Tablets often have an inert coating designed to encase the active ingredients to be administered in tablet form and to permit them to be swallowed. Capsules have an encasement which dissolves in the digestive tract permitting release of the active ingredients. If these inert ingredients

were a concern of Congress for a novel drug, it is entirely unclear to me why they would not be of similar concern in the manufacture of a "me-too" product. . . . If the tablet is too hard, or the binder indigestible so that the active ingredients are not released properly or timely, the drug's efficacy may be impaired or destroyed. If the covering of a capsule is not readily digestible, the same result may occur. *Id.* at 103–104.

Additionally, the court reasoned that when taken as a whole, the statute evinces Congress' concern about individual formulation factors:

It is argued that Congress made a legislative determination that such factors should be weighed in NDA approval of a novel compound but eschewed them with respect to their latter "me-too" counterparts. While that result may rationally obtain if one looks only at § 321, consideration of the statute as a whole seems to me to lend greater credence to the alternative interpretation advocated by the FDA. Clearly, if I were construing the meaning of "new drug" without binding authority, I would opt for the FDA's construction. *Id.* at 104.

The Third Circuit affirmed *Pharmadyne Laboratories* and did not address the district court's dictum on the "new drug" question. *Pharmadyne Laboratories*, 596 F.2d 573 (3rd Cir. 1979).

■ *Premo Pharmaceutical Laboratories Inc. v. United States*, 475 F.Supp. 52 (S.D. N.Y.1979) appears to rest on the vast expanse of middle ground between "*Lannett* and *Pharmadyne Laboratories*. In *Premo*, the court considered a suit for declaratory relief brought by a manufacturer seeking a declaration that its product was not a "new drug". The manufacturer contended that "insulase", its product, is not a "new drug" because it contains chloropropamide, the active ingredient in "Diabinese", an FDA approved drug manufactured by Pfizer Laboratories. In addressing this issue, the court rejected both the *Lannett* view that no generic drug is a "new drug" if the active ingredient is generally recognized as safe

and effective, and the *Pharmadyne* view that Congress intended that an NDA be filed for each drug product. The court reasoned that:

In interpreting the term "new drug", the court is mindful that some differences in excipients do affect the safety and effectiveness of a drug product but that others do not and that Congress has entrusted the FDA, not the Court, with finally determining the safety and effectiveness of drugs. Accordingly, when the active ingredient in a questioned drug product is the same as the active ingredient in a drug product already on the market and generally recognized as safe and effective, and when the excipients in the two drug products are different, and when the excepients in the questioned product are recognized individually to be safe, the *manufacturer* of the questioned product *is entitled to a declaration that its product is not a "new drug"* within the meaning of 21 U.S.C. § 321(P), only *if the evidence has shown no reasonable possibility that the differences between the excipients in the recognized and questioned products will make the questioned products less safe and effective than the recognized product. Id.* at 55. *(emphasis added).*

After a careful review of the case law, the statute, and the arguments of the parties, the court is convinced that the rule enunciated by Judge Pollack in *Premo Pharmaceutical* is the proper one. It permits the marketing of "me-too" drugs without "costly and time consuming FDA approval," *Premo Pharmaceutical*, 475 F.Supp. at 55, and prevents the "cumbersome and time consuming case-by-case institution of condemnation actions to rid the market of dangerous 'me-to' drugs." *Id.*

As has been previously mentioned, the action in *Premo* was a suit for declaratory relief filed by the manufacturer. And there "plaintiff introduced credible scientific and medical testimony, amply supported by the scientific literature introduced into evidence, that the differences in the bioavailability of Diabinese and Insulase will

not make the latter less safe or effective than the former." *Premo Pharmaceutical* at 56. Because the government only met the plaintiff's proof by showing a theoretical possibility that one product was less safe and effective than the other due to differences in bioavailability, it failed to carry its burden of showing "some reasonable possibility that these differences in the bioavailability of these products will affect the safety or effectiveness of Insulase." *Id.* at 57.

■ There is no reason why the appropriate rule, as announced in *Premo Pharmaceutical,* cannot be fitted to a case such as the instant one where the FDA has moved for a preliminary injunction. There are two principles which guide the court's hand in fashioning such a rule. First the Federal, Food, Drug and Cosmetic Act is intended primarily to insulate the public from dangerous substances:

> By the Act of 1938, Congress extended the range of its control over illicit and noxious articles and stiffened the penalties for disobedience. The purpose of this legislation thus touches phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely a collection of English words. *United States v. Dotterweich,* 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943).

Second, under 21 U.S.C. § 332, an injunction may issue where it is shown that there has been a violation of the statute:

> There is a sufficient showing where, as here, the Government presents evidence of violations of the provisions of a statute enacted for the protection of the public *(citations omitted).* Nor is it necessary to demonstrate the precise way in which violations of the law might result in injury to the public interest. It is sufficient to show only that the threatened act is within the declared prohibition of Congress. *(citations omitted).* It is suffi-

cient here to show that "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man . . . was and is being distributed in violation of the Food and Drug Act. *United States v. Nutrition Service, Inc.,* 227 F.Supp. 375 (N.D.Pa.1964), *aff'd* 347 F.2d 233 (3d Cir. 1965).

*See also United States v. Medwick Laboratories,* 416 F.Supp. 832 (N.D.Ill.1976). The court considers it unnecessary, therefore, to discuss at great length the four elements generally required to support a motion for preliminary injunction, *see generally Canal Authority v. Callaway,* 489 F.2d 567 (5th Cir. 1974), except to note that the government has carried its burden of demonstrating the existence of the relevant factors.

■ Accordingly, this court holds that the government is entitled to an order enjoining the distribution of generic drugs alleged to be "new drugs" within the meaning of 21 U.S.C. § 321(p), where the government demonstrates that there is some reasonable possibility that differences between the copied drug product and the generic drug product affect the safety and effectiveness of the generic drug product.

■ In applying the rule as set forth above to the facts as developed at the hearing, the court concludes that the government has carried its burden with respect to certain "Goldline" drug products. Dr. Palmer testified that the "Goldline" drug products used to treat hypertension are not generally recognized as safe and effective, nor are there any known tests of these products. Dr. Barr agreed with Dr. Palmer, and stated that he does not believe that "Goldline" products are safe and effective. Additionally, with regard to specific formulations, Dr. Barr testified that generic versions of drugs containing the active ingredients furosemide and chlorothiazide have formulation problems, and generic formulations containing the active ingredient spironolactone have severe formulation problems. Defendants' formulations of allopurinol and amitriptyline, in Dr. Barr's opinion, are not safe and effective and sustained released drugs, such as defendant's formu-

## 294

lation of diethylpropion hydrochloride, pose substantial danger because "dumping" may occur where the formulation is not proper, thus contributing to the possibility of overdose.

The government has shown by the evidence a reasonable possibility that defendants' drugs are not safe and effective. Because the government's experts have raised a reasonable possibility that the safety and effectiveness of defendants' drug products are suspect, it is incumbent upon defendants to produce evidence refuting the government's proof. This defendants have not done. Defendants' expert, Dr. Emil Smith, testified that he would assume that "Goldline" products are equivalent to brand name products, but even he conceded on cross-examination that he would like some assurances that "Goldline" products are similar to brand name products they imitate before the products are marketed.

In reaching its conclusion, the court has not disregarded defendants' arguments that a mere distributor is not the proper party to enjoin and that other distributors or manufacturers have been permitted to continue marketing similar products. These arguments, however, do not prevent the maintenance of this action nor do they persuade the court that the requested relief should not be granted. The statute clearly proscribes the distribution of such drugs into interstate commerce, 21 U.S.C. § 355(a).

Moreover, the court has not ignored evidence of the substantial economic impact caused by a rule requiring generic drug manufacturers or distributors to submit data to the FDA on certain generic drug products. On the contrary, this consideration is embodied in the rule as enunciated; the government has the burden of showing that a particular generic drug product is suspect, and only then is the distributor or manufacturer forced to bear the economic burden of obtaining specific data on its products. An assertion that a generic drug product is not a "new drug" is a shield of sorts, but it is a shield which can be pierced by competent evidence. Likewise the "new drug" definition cannot, in the opinion of this court, be construed so as to permit the wholesale disruption of the generic drug industry merely because the FDA calls a generic drug product a "new drug".

The government has also requested that defendants be ordered to recall the "Goldline" products in question. However, the court cannot conclude on the evidence presented to this point that a recall of the "Goldline" products in issue as requested by the government has been proved necessary.

Accordingly, it is

ORDERED AND ADJUDGED that plaintiff's motion for a preliminary injunction is granted in part and denied in part. It is further

ORDERED AND ADJUDGED that defendants shall cease, until further order of this court, distribution into interstate commerce "Goldline" products containing the following active ingredients:

allopurinol

spironolactone

furosemide

chlorothiazide with reserpine

amitriptyline

diethylpropion hydrochloride.

It is further

ORDERED that the motion for preliminary injunction is denied as to defendants' drug products containing prochlore-perazine maleate and chlorthalidone. It is further

ORDERED that plaintiff's request for a recall of the above listed drug products is hereby denied.